**CONTINUATION OF APPLICATION FOR SEARCH WARRANT**

I, Brent Johnson, a Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am submitting this continuation in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by Verizon, a wireless provider headquartered at 180 Washington Valley Road Bedminster, NJ 07921. The information to be searched is described in the following paragraphs and in Attachment A. This search warrant application seeks issuance of a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) that requires Verizon to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2. I am a Special Agent (SA) of the FBI, and have been so employed since December 2002. I am currently assigned to the Kalamazoo office of the FBI's Detroit Division. I am trained and experienced in the investigation of violations of Federal criminal law, including the preparation, presentation, and service of criminal complaints and arrest and search warrants.

3. The matters set forth in this continuation are either known personally to me or were related to me by other persons acting in their official capacities as officers and agents of the United States, the State of Michigan, and local jurisdictions within Michigan. Because it is submitted for the limited purpose of establishing probable cause to search for evidence, this affidavit does not necessarily recite all of the facts of the underlying investigation that are known to me or to other investigators at this time. I submit that the matters set forth in this continuation demonstrate probable cause to believe that property (defined in Fed. R. Crim. P. 41(a)(2)(A) as including information) as described in Attachment "B" to the Search Warrant Application will be found at the place to be searched, and that those items constitute evidence of the following offenses: 21 U.S.C. § 841(a)(1) [distribution of heroin].

**PROBABLE CAUSE**

4. I submit that the facts summarized in this continuation demonstrate that there is probable cause to believe that Damiane BUEHRER is responsible for the 11 Jan. 2017 death of Michigan resident Tyler Herendeen in Hillsdale County, Michigan, a death that resulted from Herendeen's ingestion of heroin and carfentanil that he obtained from BUEHRER, and that the information described in Attachment B will constitute evidence of this.

5.      At about 9:30 p.m. on 11 Jan. 2017, officers from the Michigan State Police (MSP) Jackson Post responded to an isolated location on Vorhees Road in Somerset Township, which is located in Hillsdale County in the Western District of Michigan.  There, they found a small SUV that had been consumed by fire, and also discovered a human body in the rear storage area of the vehicle that was burned beyond recognition.  Officers from the MSP Fire Investigation Unit were also on scene, and later concluded that the cause of the fire was arson.

6.      A Michigan license plate, CGC4709, was found lying on the road surface behind the vehicle, and a query of records maintained by the State of Michigan disclosed that the vehicle was a blue 2005 Ford Escape registered to a couple residing in nearby Jonesville, MI.  When later questioned by MSP investigators, the couple stated that they had sold the vehicle to their nephew, Tyler Herendeen, about a month before.

7.      When investigators interviewed Herendeen's mother, she confirmed that her son had bought the vehicle from his aunt and uncle.  She also stated that she had not seen her son since before 10 January, and that he had not responded yet to a text message she sent him on 10 January.

8.      An autopsy performed by the Lucas County Coroner's Office later determined, from dental records, that the burned body recovered from the vehicle was that of Tyler Herendeen.  Subsequent toxicology tests performed on the remains also discovered the presence of carfentanil.  Based on my training and experience, I know that carfentanil is a synthetic opioid that heroin dealers often add to their product.  On 28 Feb. 2017, MSP investigators interviewed CH, a known friend of Herendeen's, and he stated that Herendeen told him in December 2016 that he had been buying heroin from Damiane BUEHRER.

9.       According to records of the State of Michigan, BUEHRER served over six years in prison, from 2010 to 2016, for felony delivery/manufacture of controlled substance, and was on parole in Hillsdale County at the time of the fire.  Herendeen, in turn, had been arrested and charged in December 2016 for possessing controlled substances.

10.     On 21 June 2017, the Hillsdale County Central Dispatch received a 911 call from a female who stated that a friend of hers, JE, was confined at the Hillsdale County Jail and wanted to speak with MSP investigators about the arson and the body that had been recovered from the vehicle.  That same day, MSP investigators interviewed JE at the jail.  JE confirmed that he had asked his girlfriend to contact MSP for him, and that he had firsthand knowledge about the circumstances of Herendeen's death.

11. In the course of the initial interview on 21 June and a follow-up interview on 30 June, JE related that he had been staying at BUEHRER's residence since shortly before Christmas 2016, that BUEHRER was a friend of his, and that he was staying at BUEHRER's because there were outstanding arrest warrants for him at the time and BUEHRER had offered him a place to hide. JE stated that BUEHRER was a heroin dealer, and that he had seen Herendeen at BUEHRER's residence before. According to JE, Herendeen called BUEHRER on the day he died and said he wanted to come over, and then arrived early in the afternoon. Herendeen then warned BUEHRER to stay away from a heroin user named "Lane" because Herendeen had told law enforcement about Lane and did not want BUEHRER to get caught selling heroin to him. JE stated that BUEHRER took Herendeen out to his garage, and then returned alone after a time stating that he had given Herendeen a dose of heroin and that Herendeen had passed out. JE stated that BUEHRER was not concerned about this because BUEHRER's wife, KB, was also a regular heroin user and routinely passed out after taking the drug.

12. JE stated that BUEHRER then asked him to go out to the garage and to keep an eye on Herendeen because he had to go to Jackson to get KB out of jail. JE reluctantly agreed, and saw BUEHRER pull Herendeen's blue SUV into the garage before he left. JE also saw BUEHRER take Herendeen's cellphone and erase a number from the call log, which he assumed was Herendeen's pre-visit call to BUEHRER. After erasing the call log, BUEHRER tossed the phone on the front seat of Herendeen's car and left.

13. JE stated that he watched Herendeen, who was sleeping on a mattress in the garage, for several hours until BUEHRER returned with KB. Herendeen was fully clothed and wearing a winter coat and stocking cap, but JE put several blankets over him because it was very cold, and saw that he was breathing and snoring. While JE was watching Herendeen, he noticed that the phone in the car kept receiving calls. JE looked at the phone's screen several times, and saw the word "Dad" displayed as the phone rang. Subsequent investigation determined that Herendeen's father had tried repeatedly on 11 January 2017 to contact his son, without success.

14. JE went back into the house after BUERHER and KB returned, leaving the two in the garage with Herendeen. JE fell asleep for some period of time, but did notice that KB came into the house and fell asleep while BUEHRER made several trips between the house and the garage. At some point, BUEHRER came back into the house in a panic and stated that he thought Herendeen was dead, adding that he was "not going to go down for that snitch." BUEHRER then asked JE for help disposing of Herendeen's body, but JE refused to become involved. BUEHRER then told KB that she had to help him dispose of the body, and she agreed. BUEHRER then retrieved a gas can, stating that he was going to burn Herendeen's car.

BUEHRER and KB then went out to the garage and JE saw them leave in two cars, with KB driving BUEHER's car and BUEHRER driving Herendeen's car.

15.     BUEHRER and KB returned to the house sometime later on 11 January, and BUEHRER stated that it was "all taken care of."  The next morning, JE went out to the garage and saw that the area where Herendeen had been lying appeared to have been cleaned with some sort of liquid, and that the mattress Herendeen had lain on had been burned down to its springs behind the garage and the residue had been covered with straw.  That same day, JE heard on the news that a human body had been found in a burned-out car elsewhere in Hillsdale County.

16.     JE stated that BUEHRER had been dealing the drugs the whole time he stayed with him, and would typically meet his customers at remote roadside spots in the country.  Customers who were well known to BUEHRER, like Herendeen, would sometimes meet at BUEHRER's house to receive his drugs.  JE stayed at BUEHRER's residence until his own arrest in March 2017.

17.     In addition to JE, on 21 June 2017 MSP investigators also interviewed a Jonesville resident named AL.  AL admitted that, like Herendeen, he was a heroin addict, and stated that BUEHRER was their dealer.  AL stated that JE was staying with BUEHRER at the time of Herendeen's death, because JE was a fugitive from justice and BUEHRER was his friend.  AL also stated that he was familiar with the remote location where Herendeen's body and vehicle were discovered because he had met BUEHRER there in the past to obtain heroin.

18.     According to TH's parents and several friends and acquaintances of his, during the months preceding his death TH's cellphone number was **(517) 200-8232**. That was a Verizon number, and on 13 January 2017 MSP obtained a search warrant for records related to that account.  Verizon produced the records several days later, and a review of those records confirmed that the account had belonged to TH since August 2016.  Review of the records also disclosed the following communications and connection activity on 11 January 2017, the day Herendeen died, which are consistent with JE's recollection (set forth in paragraph 11) that Herendeen spoke by phone with Buehrer the morning of 11 January before he came to Buehrer's residence:

   a. At around 8:00 a.m., **8232** sent text messages to **(517) 888-4801** stating, "Hey text me when you get this.  I need a favor," followed by, "N someone to talk to."
   b. Between about 8:52 and 10:47 a.m., **8232** called **4801** approximately nine times, with each call lasting 6 to 8 seconds except for the last call, which lasted 35 seconds.  This was the last outgoing call that Herendeen ever made.

4

    c. At about 10:49 a.m., **8232** received a call from **4801** that lasted about 88 seconds.

 19. Analysis by FBI Cellular Analysis Survey Team (CAST) experts has established that between 8:00 and 11:00 a.m. on 11 January 2017, **8232** was registering with the tower and sector that served Herendeen's residence.  Beginning at about 11:08 a.m., **8232** was registering with the tower and sector that served Buehrer's residence.  Between about 12:00 p.m. and 6:25 p.m. that day, **8232** continued to register with the tower and sector that served Buehrer's residence, and based on signal strength it was approximately 3.5 miles from that tower.  Buehrer's residence is located approximately 3.5 miles from that tower and sector.

 20. The last activity for **8232** was at 6:25 p.m.

 21. In the course of investigation, MSP determined that Buehrer had a named account with AT&T for number **(517) 416-7030**.  Based on CAST analysis of data obtained from AT&T for that account, between about 10:11 a.m. and 1:21 p.m. on 11 January 2017, number **7030** was registering with the two towers and sectors that provide the clearest, best signal to Buehrer's residence.  That **7030** phone traveled out of that area at about 1:21 p.m. and proceeded to Jackson, Michigan, where it registered with the tower and sector that serves the Jackson County Jail from about 2:30 p.m. until 3:19 p.m.   This is consistent with JE's recollection that Buehrer left to retrieve KB from jail, after he had given Herendeen drugs that rendered him unconscious (noted in paragraph 12).  Also, according to the records of the Jackson County Jail, KB was released at  3:20 p.m. on 11 Jan. 2017.

 22. Between 1 and 12 January 2017, **8232** never connected with **7030**, but repeatedly connected with **4801** instead.

 23. Based on the overlapping location histories of Buehrer's **7030** phone and Herendeen's **8232** phone on 11 January, the recollection of JE, and both the connection history and communications content between **8232** and **4801** on 11 January 2017, it is reasonable to conclude that **4801** was used by Buehrer on 11 January 2017.  In fact, the conversation between Herendeen and Buehrer the morning of 11 January, which JE specifically recalled, must have been made through **4801** because connection records for **8232** establish that it did not connect with **7030** that morning.

 24. Based on my training and experience and from information provided to me by other law enforcement officers, I know that drug dealers routinely use multiple cellphones, typically using a primary cellphone associated with a named account for day-to-day activities, but using a dedicated cellphone, that is not associated with a named account and that is generally referred to as a "burner phone," for drug-trafficking communications.

25.     I am aware that Verizon usually deletes account call-detail records on a rolling basis 365 days after the data is generated.  However, I also know that Verizon retains a copy of data once it produces it in response to legal process.  On 6 February 2017, Verizon produced account data for **4801** to MSP based on a search warrant that was issued on 13 January by a Hillsdale County Judge to AT&T for a different number associated with this investigation.  That warrant also ordered other service providers to produce records subsequently requested by MSP based on the AT&T data, and MSP obtained the Verizon account data by making such a request and serving a copy of the warrant.  On 28 April 2020, I confirmed with Verizon that it retained the data in a file identified as MSP Case Number 13-165-17, Verizon Case Number 170020779, Verizon Account Number 1048444707.

<u>Types of Information Maintained by Cellular Service Providers</u>

26.     Based on my training an experience, I know that Verizon is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for Verizon subscribers may be located on the computers of Verizon.  I also know that computers located at Verizon contain information and other stored electronic communications belonging to unrelated third parties.

27.     Wireless phone providers often provide their subscribers with voicemail services.  In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail.  If the subscriber does not delete the message, the message may remain in the system of Verizon for weeks or months.

28.     Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers.  This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging" or "wireless messaging."  Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by Verizon for short periods incident to and following their transmission.  In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

29.     Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems.  This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations,

lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

30. Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question. Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

31. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

32. In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support

services, as well records of any actions taken by the provider or user as a result of the communications.

## Information to be Searched and Things to be Seized

33.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Verizon to disclose to the Government copies of the records and other information (including the content of stored communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

34.     I am advised by the U.S. Attorney's Office that this Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).  I am also advised that, pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

35.     Based upon the above information, I submit there is probable cause to believe that Damiane BUEHRER committed the felony crime of distributing a controlled substance resulting in death, in violation of 21 U.S.C. § 841(a), in the Western District of Michigan.  Accordingly, there is probable cause to believe that the account information, including historical location-information, described in Attachment B will constitute evidence of these criminal violations.

## AUTHORIZATION REQUEST

36.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. Section 2703(c).  I further request that the Court authorize execution of the warrant at any time of day or night, because the execution of this warrant does not involve intrusion into a physical space by government agents, will be performed in part by employees of Verizon who are not subject to the authority of investigating agents, and because examination of the property provided by Verizon will be performed by agents of the FBI on FBI premises.